558 P.2d 894

**MANHATTAN–DICKMAN CONSTRUCTION COMPANY, an Arizona Corporation, and Allison Steel Manufacturing Co., an Arizona Corporation, Appellants and Cross-Appellees,**

v.

**Wayne T. SHAWLER and Michael F. Kumler, Appellees and Cross-Appellants.**

No. 12589–PR.

Supreme Court of Arizona,
In Banc.

Nov. 18, 1976.

**550**

O'Connor, Cavanagh, Anderson, West-over, Killingsworth & Beshears by Richard J. Woods, Phoenix, for Manhattan-Dick-man.

Black, Robertshaw, Frederick, Copple & Wright by Richard A. Black, Phoenix, for Allison Steel.

Charles M. Brewer, Ltd., Phoenix by Leonard W. Copple, Tempe, and Herbert Mallamo, Phoenix, for appellees and cross-appellants.

Robert K. Park, Chief Counsel, State Compensation Fund by J. Victor Stoffa, Phoenix, amicus curiae.

STRUCKMEYER, Vice Chief Justice.

This action was brought by Wayne T. Shawler and Michael F. Kumler to recover damages for injuries sustained during the course of construction of a coliseum at the State Fairgrounds in Phoenix, Arizona. Following trial, verdicts were returned in favor of plaintiffs against Manhattan-Dickman Construction Company and Allison Steel Manufacturing Company. On appeal and cross-appeal, the Court of Appeals by memorandum decision reversed, holding that the evidence was not sufficient to support a finding of negligence against either Manhattan-Dickman or Allison Steel. We accepted review. Opinion of the Court of Appeals vacated.

Manhattan-Dickman, as general contractor for the State of Arizona, entered into subcontracts with the Allison Steel Manufacturing Company and the Raymar Contracting Company. Allison Steel contracted to fabricate and install certain structural steel and other ironwork. In part it was required to install hanger rods from the roof of the structure to support an aluminum gridwork upon which acoustical ceiling tiles were to be placed. The hanger rods were to be attached to roof cables which were strung across the top of the coliseum, connected at each end to a concrete ring beam which circled the perimeter of the roof. At the concrete ring beam, the hanger rods had to be attached to the underside of the concrete so that support would be provided for the outer edges of the aluminum gridwork (ceiling). The architect's drawings (see drawing taken from Plaintiff's Exhibit 2a)

[See following illustration]

Concrete Ring Beam

SHOT STUD

MOST EXTREME ANGLE

Z Z x 4 x Z x ¼ x Z
PUNCH ⁹⁄₁₆" ∅ HOLE

THREAD

NUT

WASHER

Z clip

⅜" HANGER Rod

provided that under the concrete ring beam the upper ends of the hanger rods were to be bolted through the bottom part of steel plates having a "Z" shape. The "Z"-shaped steel plates were to be anchored to the concrete ring beam using a "shot stud." The shot stud was to be embedded in the concrete by means of a gun device which used an explosive charge to drive the stud into the concrete to the desired depth.

Allison Steel completed the hanger rod installation and plaintiffs, employees of Raymar, were bolting the aluminum grid upon which the acoustical ceiling was to rest to the bottom end of the hanger rods when a stud which was embedded in the concrete ring beam pulled loose. The Z-clip holding the hanger rod to the concrete ring beam gave way, causing a portion of the gridwork to collapse and plunging the plaintiffs 39 feet to the floor below.

■ Both Allison Steel and Manhattan-Dickman urge that the trial court erred when it denied their motions for directed verdicts and for judgments notwithstanding the verdicts, or in the alternative for a new trial, for the reason that there was no reasonable evidence to support their asserted negligence. But we think the evidence of negligence is clear even to the point of being gross.

In deciding the issue of whether there was reasonable evidence of negligence, the Court will view the evidence in the light most favorable to the party who prevailed in the trial, *E. L. Jones Const. Co. v. Noland,* 105 Ariz. 446, 466 P.2d 740 (1970), and if there is evidence to support the judgment, it will be sustained. *Polk v. Koerner,* 111 Ariz. 493, 533 P.2d 660 (1975). In reviewing the sufficiency of the evidence to support a verdict, and judgment for a plaintiff, the appellate court will give the appellee the benefit of every favorable inference which can be drawn from the evidence. *Atchison, T. & S. F. Ry. Co. v. Parr,* 96 Ariz. 13, 391 P.2d 575 (1964). *See also, Tucson Title Insurance Company v. D'Ascoli,* 94 Ariz. 230, 383 P.2d 119 (1963); *Boies v. Raynor,* 89 Ariz. 257, 361 P.2d 1 (1961).

George Plecas, in charge of construction for Allison Steel, testified that by occupa-

tion he was a structural ironworker; that it was the responsibility of Allison to attach the Z-clips; that a ramset gun is a pistol or a gun into which a stud is placed "and you fire it into the concrete and it has threads on the end of it to fasten a nut to." In response to the question whether the studs ever pulled out, Plecas answered that if the gun was not held right the shot sometimes would come back out and break the concrete. Among other things, it was Plecas' responsibility to inspect the shot (studs). He testified that he visually inspected the stud which held the Z-clip. This visual inspection was made from about 55 feet from where the accident occurred. If the rod was hanging there, that was his inspection and he did not go to where he could reach up and shake the rod.

Donald Carroll testified that he had been an ironworker about 25 years; that he has done work for Manhattan-Dickman under Wayne Holland, Superintendent for Manhattan-Dickman on the coliseum job. Carroll did miscellaneous ironwork for Manhattan-Dickman; that is, work that wasn't contracted out, or work that had to be changed. After the accident, he modified the hanger rods in the corners of the perimeter of the concrete ring beam at the request of Wayne Holland.

Carroll testified that he removed some of the ramsets (studs) and:

"Q. Tell us what you did and what the condition of them was when you removed them.

A. Some of them were curled like they had hit something hard into the concrete, and it fractured the concrete. When I hit the top of them with a hammer, the Z-plates in the rod would come loose and bring the stud right down with it, and large chunks of concrete.

Q. What did you remove these with?

A. Usually just a hammer or shake them and they would come loose.

Q. Shake them with your hands?

A. Shake the rod with my hand."

Although numerous grounds of negligence are suggested by appellees, we think it is sufficient to say that from the foregoing the jury could have reasonably and fairly concluded as to Allison Steel that its employees failed to set the studs securely in the concrete ring and that, further, the inspection by Plecas, Allison's superintendent, of the work was wholly inadequate to disclose the resulting dangerous weakness in the supports for the acoustical ceiling. It is also clear that since by Article 12 of the General Conditions of the Contract for the Construction of Buildings "the Contractor shall take all necessary precautions for the safety of employees on the work * * *" the jury could have also concluded that Manhattan-Dickman, the contractor and co-ordinator of the work (Contract, Special Conditions, subsec. 4), in advising Raymar to proceed with the installation of the ceiling without a reasonably careful inspection which would disclose the structural weakness in the attachment of the hanger rods under the concrete beam was negligent.

Manhattan-Dickman urges that the trial court erred in admitting the testimony of Carroll that after the accident he was instructed by Wayne Holland, Superintendent for Manhattan-Dickman, to modify the installation of the hanger rods under the concrete beam. Appellant asserts that such evidence was highly prejudicial because it suggested an admission of culpability on the part of Manhattan-Dickman.

■ The general rule, supported by the great weight of authority, is that evidence of repairs or alterations taken after an accident is not admissible to prove negligence; neither is it an admission of negligence. *Slow Development Co. v. Coulter,* 88 Ariz. 122, 127, 353 P.2d 890 (1960). However there are certain well-established exceptions. One is that such evidence is admissible to show that the control of the premises was in the defendant where control is a matter of dispute. *Morehouse v. Taubman Company,* 5 Cal.App.3d 548, 85 Cal.Rptr. 308 (1970), and cases cited in 64 A.L.R.2d 1299, 1311, anno: Admissibility of Evidence of Repairs etc. after Accident.

■ Defendant Manhattan-Dickman's control of the premises was a matter of dispute. The plaintiffs in their pre-trial

statement asserted that the defendant Manhattan-Dickman was negligent "in failing to make necessary inspection to ascertain that the ramset studs were being properly attached to the ring beam." By its answer, Manhattan-Dickman denied "that it retained control over the use of the method and manner in which the frames [the aluminum gridwork] were installed." It is therefore clear that testimony of Donald Carroll that he was employed by Manhattan-Dickman to modify the method of attaching the hanger rods to the ring beam was relevant to the disputed issue of the general contractor's control of the work.

The principle of liability upon which appellees rely is set forth in § 414, Restatement of Torts 2d:

"§ 414. Negligence in Exercising Control Retained by Employer

One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

The jury could believe it was Manhattan-Dickman's duty to exercise such control over Allison's work, at least to the extent that dangerous defects which might make Allison's work unsafe to others would be discovered.

"The general rule which defines the common law obligation of the general contractor to the employee of the subcontractor imposes upon the former the obligation to exercise ordinary care to furnish the latter with a reasonably safe place in which to work or, if there is danger attendant upon his work which arises from conditions that are not obvious, to give the employee reasonable warning of such danger. (*Austin v. Riverside Portland Cement Co., supra,* 44 Cal.2d 225, 233, 282 P.2d 69; *Dingman v. A. F. Mattock Company, supra,* 15 Cal.2d 622, 624, 104 P.2d 26; *Delk v. Mobilhomes, Inc.,* 118 Cal.App.2d 529, 531, 258 P.2d 75; *Oldham v. Atchison, T. & S. F.*

*Ry. Co.,* 85 Cal.App.2d 214, 218, 192 P.2d 516)." *Jean v. Collins Construction Co.,* 215 Cal.App.2d 410, 416–417, 30 Cal.Rptr. 149, 153 (1963).

■ Appellants complain that the trial court gave an instruction in which certain portions of the General Construction Safety Code as adopted by the Industrial Commission of Arizona were read to the jury with this admonition:

"Should you find that any party to this suit violated any provision of the foregoing code which I have just read to you, then that party would be negligent as a matter of law and you should then consider the issue of whether that negligence was a proximate cause. of Plaintiffs' injuries."

Exception was taken for the reason that the violation of the General Construction Safety Code was an unlawful delegation to the Industrial Commission of legislative power and did not constitute negligence per se. We think, however, that the adoption of the safety code by the Industrial Commission was not pursuant to an unconstitutional delegation of legislative power and that a violation of the code was negligence per se.

By A.R.S. § 23–107(A)(1) and (2), the Commission has the duty to "[a]dminister and enforce all laws for the protection of life, health, safety and welfare of employees in every case" and the full power, jurisdiction and authority to "[f]ormulate and adopt rules and regulations for effecting the purposes" of Article 1 of the Workmen's Compensation Act. At the time of this accident, by A.R.S. § 23–922, the Industrial Commission was also authorized to "adopt rules of procedure, rules for fixing rates and for presenting claims *and other rules and regulations necessary to conduct its business.*" (Emphasis supplied) *See* R.S. 1928, § 1394. Pursuant to this authority, the Industrial Commission on August 15, 1940 adopted a general safety code which was re-adopted in 1957 and was, with modifications, in effect at the time of the accident. There has, consequently, been ac-

ceptance over a long period of time, by the construction industry, the Legislature and other concerned persons, of the Industrial Commission's safety code. Such long acquiescence of administrative action in adopting regulations for safety of the industry suggests both legislative approval of the administrative action and acceptance of administrative construction of its statutes. Cf. *Long v. Dick,* 87 Ariz. 25, 29, 347 P.2d 581, 584 (1959). Contemporaneous construction by the Legislature and Executive Department is important and of controlling influence. *Clark v. Boyce,* 20 Ariz. 544, 556, 185 P. 136, 141 (1919).

We are reinforced in our conclusion by the action of the Legislature in 1968, Fourth Special Session, Ch. 6, § 10. The Legislature specifically provided under the Title "Duties and Powers of the Industrial Commission Relating to Safety" that the Commission would formulate safety standards for the prevention of accidents and promulgate them to apply to both employers and employees. The subsequent amendment to the Workmen's Compensation Act demonstrates beyond question that the Legislature believed it was appropriate for the Industrial Commission to exercise the power to provide for safety of workmen and the prevention of industrial accidents.

It is argued, citing *State v. Marana Plantations,* 75 Ariz. 111, 252 P.2d 87 (1953), that it is fundamental the power entrusted to the Legislature cannot be relinquished or delegated. If this were literally true, we would be compelled to hold Ch. 6, § 10 of the Fourth Special Session of the Laws of 1968 unconstitutional. We, however, believe that the rule applicable to this case is best stated in *Memorial Gardens Association, Inc. v. Smith,* 16 Ill.2d 116, 131, 156 N.E.2d 587, 596 (1959);

"There is a distinction between the delegation of true legislative power and the delegation of subordinate authority to exercise the law. [Citations] While the legislature may not divest itself of its proper function of determining what the law shall be, it may authorize others to do those things which it might properly but cannot understandingly or advantageously do itself. [Citations]."

The constitutional doctrine of separation of powers was not intended to confine the legislature to the alternatives of complete inaction or the imposition of rigidly inflexible laws which would distort rather than promote its objective. *In re Bunker Hill Urban Renewal Project 1B,* 61 Cal.2d 21, 37 Cal.Rptr. 74, 389 P.2d 538 (1964).

The Commission was originally authorized to adopt rules and regulations to effectuate the purposes of the compensation act and such rules and regulations as were necessary to carry out its business. We think the Legislature had the power to delegate to the Industrial Commission what it possibly felt it could not advantageously do itself; namely, to prescribe the terms and conditions of a general construction safety code. Such a code could properly be left to administrative action rather than to rigidly inflexible laws. The language of the Court of Appeals of New York in *Humphrey v. State Insurance Fund,* 298 N.Y. 327, 83 N.E.2d 539 (1949), is particularly applicable:

"Quite apart from other considerations, it is clear that section 83 of the Workmen's Compensation Law—providing in part that the fund 'shall adopt rules for the conduct of [its] business'—obviously sanctions special rules dealing with matters not provided for by the broad terms of the statute. Rules either in conflict with the provisions of the compensation law or inconsistent with its design and purpose would undoubtedly be invalid, but the regulation before us did not so offend." 83 N.E.2d at 541.

Appellants argue that violations of the 1940 and 1957 safety codes could not have been prosecuted criminally. But we think since the question of the propriety of criminal prosecution for violations of the code as it existed prior to 1968 has long been mooted by the passage of time, that it is unnecessary to reach that problem.

Manhattan-Dickman urges that the trial court erroneously instructed the jury on the

effect of contributory negligence in Arizona. The court charged the jury:

"If you find that either or both of the plaintiffs were negligent and that such negligence was a proximate cause of the Plaintiffs' injuries, then your verdict should but need not be in favor of the Defendants and against the contributorily negligent Plaintiff or Plaintiffs as the case may be."

Manhattan-Dickman argues that the proper instruction requires the use of the word "should" alone, and cites *Anderson v. Gobea,* 18 Ariz.App. 277, 501 P.2d 453 (1972), where the instruction simply stated that in the event of plaintiffs' negligence proximately contributing to their injuries the verdict should be in favor of the defendants. The problem here arises out of the different meanings attributable to the word "should."

In *Layton v. Rocha,* 90 Ariz. 369, 368 P.2d 444 (1962) we said:

"Since under our decisions a verdict for the plaintiff is permissible irrespective of the strength of the evidence concerning plaintiff's negligence, and the jury under the law as announced may decide the issue for plaintiff even though the evidence clearly shows he was guilty of contributory negligence, we cannot say that the court committed reversible error by phrasing the instruction permissibly with the word 'may'." 90 Ariz. at 371, 368 P.2d at 445.

■ "Should" can be used to indicate desirability or preference rather than an obligation or mandate. *George v. Oswald,* 273 Wis. 380, 78 N.W.2d 763 (1956). Although "should" is the past tense of "shall," and its usage was approved in *Layton v. Rocha,* as is evident from the foregoing quotation, the court did not intend to convey an absolute sense of duty and obligation. And *see Heimke v. Munoz,* 106 Ariz. 26, 470 P.2d 107 (1970). "Should" as used in an instruction on contributory negligence is not to be taken as a word of imperative character so that the province of the jury is invaded as to the weight to be given to the plaintiffs' contributory negligence. *E. g.*

*Smith v. State,* 142 Ind. 288, 41 N.E. 595 (1895). Since the word "should" tends to be confusing, we suggest that the instruction approved by the Court of Appeals in *Winchester v. Palko,* 18 Ariz.App. 534, 504 P.2d 65 (1972), be used. As stated there, the word "may" "much more clearly notifies the jury of its function and powers concerning the defense of contributory negligence." The court's instruction to the jury, being a clear exposition of the law and in accord with our prior decisions, was correct in that the jury was advised that the word "should" was not used in the obligatory or mandatory sense.

The court instructed the jury to the effect that when a person works in a dangerous place, taking risks which an ordinary, prudent person would avoid, the necessity of such work insofar as it limits the caution which a workman can take for his own safety lessens the amount of caution required of him by law in the exercise of ordinary care. Manhattan-Dickman complains of the instruction for the reason it indicated that a lesser standard of care was required of the plaintiffs than that of an ordinary, prudent person and also that it was a comment on the evidence. We do not, however, think that the instruction misled the jury.

The care required to be exercised by an ordinary, prudent man varies with the circumstances of each case. If a person is required to work in a position of danger, the amount of care which a jury could find he ought to exercise for his own safety might be less by reason of the necessity of giving part of his attention to his work. *Marincovich v. Oriana, Inc.,* 13 Cal.App.3d 146, 91 Cal.Rptr. 417 (1970). The instruction does not change the standard of care required to be exercised by the plaintiffs for their own safety. What it does say is that ordinary care may be the exercise of less care in some circumstances than others.

We think further that if the instruction can be criticized as a comment on the evidence, it is not such as would prejudice defendants with the jury.

■ The defendants complain that plaintiffs' counsel was guilty of prejudicial conduct in his closing arguments. The record does not establish, however, that they complained of the plaintiffs' closing argument until the jury had been instructed and retired to consider its verdict. The established rule is that the failure to make a timely objection is a waiver of error. *Beliak v. Plants*, 93 Ariz. 266, 379 P.2d 976 (1963). In the interest of effective and speedy justice, a trial court must be timely given an opportunity to correct errors.

■ Manhattan-Dickman complains of the trial court's action in refusing to submit what it calls "special verdicts" to the jury. The special verdicts were that if Manhattan-Dickman was found liable to the plaintiffs, the jury should answer certain questions relating to why it found a favorable general verdict for plaintiffs. Manhattan-Dickman asserts that it was entitled to know the basis of its liability to plaintiffs.

By the Rules of Civil Procedure, 49(h), 16 A.R.S., a court "may" submit to the jury together with appropriate forms of a general verdict, written interrogatories upon one or more issues of fact. The language of the rule was taken directly from § 21–1009 ACA 1939 and is permissive. We have held:

> "Defendant asked that a large number of special interrogatories be submitted to the jury, which request was refused by the court. Sections 21–1007, 21–1008 and 21–1009, A.C.1939, provide that special interrogatories may be submitted to the jury along with a general verdict. This, however, is entirely discretionary with the court, and no litigant may demand this as a matter of right." *Powell v. Langford*, 58 Ariz. 281, 287, 119 P.2d 230, 232 (1941).

We find no error in the trial court's refusal to submit special interrogatories which basically would reflect the jury's opinion as to whether the negligence of Raymar and Allison primarily caused the accident.

## THE CROSS–APPEAL OF WAYNE SHAWLER AND MICHAEL KUMLER

■ The cross-appeal of Wayne Shawler and Michael Kumler arises out of these facts. The jury found damages in favor of Shawler in the amount of $100,000 and in favor of Kumler in the amount of $60,000. Both cross-appellants moved the court below for an additur to the damages, or in the alternative for a new trial on the issue of damages only. From the denial of their motions, they duly perfected this cross-appeal. They also claim error in the refusal of the trial court to admit evidence of a $31,015.74 lien by the State Compensation Fund against the Kumler judgment and $47,107.65 against the Shawler judgment, a total of $78,123.39. The liens represent workmen's compensation and medical benefits expended on plaintiffs to the time of trial.

A.R.S. § 23–1023 A and C provide:

> "A. If an employee entitled to compensation under this chapter is injured or killed by the negligence or wrong of another not in the same employ, such injured employee, or in event of death his dependents, may pursue his remedy against such other person.

> \*      \*      \*      \*      \*      \*

> C. If he proceeds against such other person, compensation and medical, surgical and hospital benefits shall be paid as provided in this chapter and the insurance carrier or other person liable to pay the claim shall have a lien on the amount actually collectible from such other person to the extent of such compensation and medical, surgical and hospital benefits paid. \*  \*  \* "

Cross-appellants also complain of the trial court's refusal to instruct the jury as to the existence of the foregoing lien.

The problem here originated in questions concerning workmen's compensation asked of jurors on voir dire by counsel for Allison Steel. Counsel for cross-appellants moved for a mistrial as follows:

"I have a motion for a mistrial on this matter because we asked the Court for a motion in limine to exclude any reference under the Myers case, under the El Dorado case, where it's been stated by our court, it's reversible error, any mention of Workman's Compensation, and Mr. Black purposely and blatantly led two or three jurors into discussions about 'Are you satisfied with your Workman's Comp. lien.' 'Are you satisfied with your Workman's Compensation taking care of you.'

\* \* \* \* \* \*

It's just like me asking them if they had an insurance claim, familiar with insurance companies, have the insurance companies been fair, might just as well say the same thing with Workman's Comp., the whole place knows as far as I'm concerned now, and it's a complete violation of the order of the Court, stipulations that went on here on the record, and I think we are completely tarred with this brush now, and I don't think there's any way I can clean it up and there's not [sic] reason I have to clean it up especially when it's been brought to the Court's attention beforehand and opposing Counsel know about it, there's no reason to bring any of that up here today."

This motion for a mistrial was denied.

Thereafter, during the course of the trial, the presence of workmen's compensation was repeatedly emphasized, first by Stanford Moore, a safety inspector for the Industrial Commission, whose testimony on deposition over objection was admitted as follows:

"Question: Was Raymar Contracting Corporation under your jurisdiction?

Answer: To the best of my knowledge, yes."

(Plaintiffs in the case were working for Raymar at the time of their injuries.) By cross-examination of the plaintiffs' doctor:

"[Counsel for Allison Steel] Doctor, along those same lines, Jay [sic] Shawler has been given a permanent disability rating of thirty-five per cent.

\* \* \* \* \* \*

A. Correct.

Q. And the same with Mike Kumler. I believe he has a fifteen or twenty per cent—

A. Twenty per cent I believe."

And finally, in closing argument defense counsel told the jury:

"There's no evidence in this record these doctors charged these boys anything in this case \* \* \*."

and that the jury should not:

"award one penny for medical expenses"

and:

"that goes for the future medical too."

At the conclusion of the evidence, cross-appellants sought to have the jury instructed as to the statutory lien of the State Compensation Fund, but this also was refused.

We held in *Miller v. Schafer,* 102 Ariz. 457, 432 P.2d 585 (1967), that workmen's compensation coverage is irrelevant and improperly introduced when there is no apparent purpose other than to influence the jury. We quoted with approval from the annotation in 77 A.L.R.2d 1154, at pages 1155 and 1156:

"Generally, the introduction of information showing or tending to show the jury that the plaintiff is entitled to workmen's compensation benefits has been held to constitute prejudicial error necessitating a reversal or a new trial. \* \* \*"

Counsel's conduct in injecting and continuously emphasizing workmen's compensation, together with the refusal of the court to instruct the jury as requested, was palpable error.

It is ordered that this cause be returned to the Superior Court of Maricopa County with directions that cross-appellants herein be granted additurs in the amounts of $31,015.74 and $47,107.65, respectively, conditioned as set forth in A.R.S. 16, Rules of Civil Procedure, Rule 59(i).

CAMERON, C. J., and HAYS, HOLOHAN and GORDON, JJ., concur.